## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## MARSHALL DIVISION

| | | |
|---|---|---|
| **ARTHREX, INC.,** | § | |
| | § | |
| *Plaintiff*, | § | **Civil Action No. 2:15-CV-1047** |
| | § | |
| v. | § | |
| | § | |
| **SMITH & NEPHEW, INC., AND** | § | **JURY TRIAL DEMANDED** |
| **ARTHROCARE CORP.** | § | |
| | § | |
| *Defendants*. | § | |

## <u>COMPLAINT FOR PATENT INFRINGEMENT</u>

This is an action for patent infringement in which Plaintiff, Arthrex, Inc. (hereinafter "Arthrex"), complains against Defendants, Smith & Nephew, Inc. (hereinafter "Smith & Nephew"), and ArthroCare, Corp. (hereinafter "ArthroCare") (together "Defendants") and alleges as follows:

### <u>PARTIES</u>

1.     Arthrex is a Delaware corporation having its principal place of business at 1370 Creekside Boulevard, Naples, Florida  34108.

2.     Smith & Nephew is a Delaware corporation with its principal place of business at 1450 Books Road, Memphis, Tennessee  38116.

3.     ArthroCare is a Delaware corporation with is principal place of business at 7000 W. William Cannon Drive, Building 1, Austin, Texas 78735.

4.     On or about May 29, 2014, Smith & Nephew acquired ArthroCare. [Exhibit 1].

5.      Smith & Nephew acquired ArthroCare through a merger of Rosebud Acquisition Corporation, a Delaware corporation and wholly owned subsidiary of Smith & Nephew, with ArthroCare surviving the merger as a wholly-owned subsidiary of Smith and Nephew.

6.      As intended by the merger of Smith & Nephew and ArthroCare, Defendants have, combined their portfolios of products and have shared their resources for marketing and customer acquisition.  Smith & Nephew and ArthroCare have publicly indicated that they are integrating with one another.

7.      Indeed, Smith & Nephew is now making, selling and/or offering for sale numerous products that are and/or were identical to ArthroCare products as Smith & Nephew products including, but not limited to, Smith & Nephew's Titan Ti Suture Implants, SpeedScrew Knotless Implants, SpeedFix Suture Implants, SpeedLock Knotless Implants, SpeedLock Hip Knotless Implants, Spartan Suture Anchors, LabraLock P Knotless Implants, and Multi-Fix Knotless Implants. ArthroCare continues to sell these products under its name as well.  These and other products are the subject of this lawsuit.

## JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and § 1338 (patents).

9.      Smith & Nephew is subject to personal jurisdiction in this Court.  In particular, this Court has personal jurisdiction over Smith & Nephew because it has engaged in such continuous, systematic and substantial activities within this State, including substantial marketing and sales of products in this State and this judicial district.  Furthermore, upon information and belief, this Court has personal jurisdiction over Smith & Nephew in this case because Smith & Nephew has committed acts giving rise to Arthrex's claim for patent

infringement within and directed to this judicial district.  Finally, this Court has personal jurisdiction over Smith & Nephew as a result of Smith & Nephew availing itself of this Court to bring suit against Arthrex for patent infringement in the past. [See *Smith & Nephew Inc. v. Arthrex, Inc.*, Eastern District of Texas, Filed on Aug. 7, 2007, Case No. 2:07-cv-00335, initially assigned to Honorable T. John Ward].

10.     ArthroCare is subject to personal jurisdiction in this Court.  In particular, this Court has personal jurisdiction over ArthroCare because it has engaged in such continuous, systematic and substantial activities within this State, including substantial marketing and sales of products in this State and this judicial district, and has established its headquarters in this State. Furthermore, upon information and belief, this Court has personal jurisdiction over ArthroCare in this case because ArthroCare has committed acts giving rise to Arthrex's claim for patent infringement within and directed to this judicial district.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b).

## BACKGROUND

12.     Arthrex is an innovative company that designs, manufactures, and sells inventive medical devices used to treat patients suffering from a variety of injuries. Among other things, Arthrex designs, manufactures, and sells medical devices in the field of orthopedic medicine including, but not limited to, suture anchors, interference screws, and drill guides for use in various surgical procedures.

13.     Arthrex is uniquely focused on improving the treatment of patients by investing in research and development and by advancing medicine through surgeon training and education.

To that end, Arthrex also offers a comprehensive program of educational and support services to orthopedic surgeons.

14.     Arthrex protects its intellectual property in a variety of ways, including by obtaining patents on its inventive technology. Arthrex has over 200 patents, including patents directed to, for example, suture anchors, interference screws and other medical devices, as well as related instrumentation such as drill guides. Arthrex products covered by its patents are marked with a corresponding patent number.

15.     Smith & Nephew is a competitor of Arthrex and is also in the business of manufacturing and selling medical devices including, but not limited to, suture anchors, interference screws, and drill guides.

16.     Upon information and belief, Smith & Nephew monitors patent literature, including issued patents and published patent applications related to medical devices including, but not limited to, suture anchors, interference screws, and drill guides.

17.     ArthroCare is also a competitor of Arthrex and is also in the business of manufacturing and selling medical devices including, but not limited to, suture anchors.

18.     Upon information and belief, ArthroCare monitors patent literature including issued patents and published patent applications related to medical devices including, but not limited to, suture anchors.

## ARTHREX'S PATENTS

19.     Surgeons in the field of orthopedic medicine frequently treat injured patients by reattaching or replacing their torn body tissue, such as a rotator cuff or an anterior cruciate ligament.   Arthrex has obtained a number of patents relating to implants and instrumentation used for these surgical procedures.   The Arthrex implants and instrumentation at issue in this

lawsuit relate to five families of patents obtained by Arthrex.  These are Arthrex's Drill Guide patent, Cross-Support Suture Anchor Patents, Corkscrew Patents, Knotless Suture Anchor Patent, and Bioabsorbable Interference Screw Patents.  The patents in these families are as follows:

**Arthrex's Drill Guide Patent**

**U.S. Patent No. 5,993,451**

20.     On November 30, 1999, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 5,993,451 ("the '451 patent"), entitled "Cannulated Suture Anchor Drill Guide."  A true and correct copy of the '451 patent is attached hereto as Exhibit 2.

21.     The '451 patent names Stephen S. Burkhart as an inventor.

22.     Arthrex is the owner by assignment of all right, title and interest in the '451 patent.

23.     The '451 patent generally relates to, *inter alia*, a novel surgical instrument for installing a suture anchor into bone.

**Arthrex's Cross-Support Suture Anchor Patents**

**U.S. Patent No. 8,343,186 B2**

24.     On January 1, 2013, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,343,186 ("the '186 patent"), entitled "Fully Threaded Suture Anchor with Transverse Anchor Pin."  A true and correct copy of the '186 patent is attached hereto as Exhibit 3.

25.     The '186 patent names Peter J. Dreyfuss and William C. Benavitz as inventors.

5

26.      Arthrex is the owner by assignment of all right, title and interest in the '186 patent.

27.      The '186 patent generally relates to, *inter alia*, a novel suture anchor assembly.

## U.S. Patent No. 8,623,052 B2

28.      On January 7, 2014, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,623,052 B2 ("the '052 patent"), entitled "Suture Anchor."  A true and correct copy of the '052 patent is attached hereto as Exhibit 4.

29.      The '052 patent names Peter J. Dreyfuss and William C. Benavitz as inventors.

30.      Arthrex is the owner by assignment of all right, title and interest in the '052 patent.

31.      The '052 patent generally relates to, *inter alia*, a novel suture anchor assembly.

## U.S. Patent No. 8,801,755 B2

32.      On August 12, 2014, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,801,755 B2 ("the '755 patent"), entitled "Suture Anchor."  A true and correct copy of the '755 patent is attached hereto as Exhibit 5.

33.      The '755 patent names Peter J. Dreyfuss and William C. Benavitz as inventors.

34.      Arthrex is the owner by assignment of all right, title and interest in the '755 patent.

35.      The '755 patent generally relates to, *inter alia*, a novel suture anchor assembly.

## U.S. Patent No. 8,821,541 B2

36.      On September 2, 2014, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,821,541 B2 ("the '541 patent"), entitled "Suture

Anchor With Insert-Molded Rigid Member."   A true and correct copy of the '541 patent is attached hereto as Exhibit 6.

37.     The '541 patent names Peter J. Dreyfuss and William C. Benavitz as inventors.

38.     Arthrex is the owner by assignment of all right, title and interest in the '541 patent.

39.     The '541 patent generally relates to, *inter alia*, a novel suture anchor and suture anchor assembly.

### Arthrex's Corkscrew Patents

### U.S. Patent No. 6,511,499 B2

40.     On January 28, 2003, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 6,511,499 B2 ("the '499 patent"), entitled "Corkscrew Suture Anchor."  A true and correct copy of the '499 patent is attached hereto as Exhibit 7.

41.     The '499 patent names Reinhold Schmieding, R. Donald Grafton, and Mark Brunsvold as inventors.

42.     Arthrex is the owner by assignment of all right, title and interest in the '499 patent.

43.     The '499 patent generally relates to, *inter alia*, a novel suture anchor.

### U.S. Patent No. 6,214,031 B1

44.     On April 10, 2001, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 6,214,031 B1 ("the '031 patent"), entitled "Corkscrew Suture Anchor."  A true and correct copy of the '031 patent is attached hereto as Exhibit 8.

45.     The '031 patent names Reinhold Schmieding, R. Donald Grafton, and Mark Brunsvold as inventors.

46.     Arthrex is the owner by assignment of all right, title and interest in the '031 patent.

47.     The '031 patent generally relates to, *inter alia*, a novel suture anchor.

### U.S. Patent No. 7,195,634 B2

48.     On March 27, 2007, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 7,195,634 B2 ("the '634 patent"), entitled "Corkscrew Suture Anchor."  A true and correct copy of the '634 patent is attached hereto as Exhibit 9.

49.     The '634 patent names Reinhold Schmieding, R. Donald Grafton, and Mark Brunsvold as an inventors.

50.     Arthrex is the owner by assignment of all right, title and interest in the '634 patent.

51.     The '634 patent generally relates to, *inter alia*, a novel suture anchor.


### Arthrex's Knotless Suture Anchor Patent

### U.S. Patent No. 7,329,272 B2

52.     On February 12, 2008, the United States Patent and Trademark Office duly and lawfully issued United States Patent No.7,329,272 B2 ("the '272 patent"), entitled "Graft Fixation Using a Plug Against Suture."  A true and correct copy of the '272 patent is attached hereto as Exhibit 10.

53.     The '272 patent names Stephen S. Burkhart, Peter J. Dreyfuss, and Neal S. ElAttrache as an inventors.

54.     Arthrex is the owner by assignment of all right, title and interest in the '272 patent.

55.     The '272 patent generally relates to, *inter alia*, a novel system for interference fixation.

## Arthrex's Bioabsorbable Interference Screw Patents

### U.S. Patent No. 6,875,216 B2

56.     On April 5, 2005, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 6,875,216 B2 ("the '216 patent"), entitled "Tapered Bioabsorbable Interference Screw for Endosteal Fixation of Ligaments."  A true and correct copy of the '216 patent is attached hereto as Exhibit 11.

57.     The '216 patent names Eugene M. Wolf as an inventor.

58.     Arthrex is the owner by assignment of all right, title and interest in the '216 patent.

59.     The '216 patent generally relates to, *inter alia*, a novel bioabsorbable interference screw.

### U.S. Patent No. 7,322,986 B2

60.     On January 28, 2008, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 7,322,986 B2 ("the '986 patent"), entitled "Bioabsorbable Interference Screw for Endosteal Fixation of Ligaments."  A true and correct copy of the '986 patent is attached hereto as Exhibit 12.

61.     The '986 patent names Eugene M. Wolf as an inventor.

62.     Arthrex is the owner by assignment of all right, title and interest in the '986 patent.

63.     The '986 patent generally relates to, inter alia, a novel method of interference fixation.

### U.S. Patent No. 6,629,977 B1

64.     On October 7, 2003, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 6,629,977 B1 ("the '977 patent"), entitled "Tapered Bioabsorbable Interference Screw And Method For Endosteal Fixation of Ligaments."  A true and correct copy of the '977 patent is attached hereto as Exhibit 13.

65.     The '977 patent names Eugene M. Wolf as an inventor.

66.     Arthrex is the owner by assignment of all right, title and interest in the '977 patent.

67.     The '977 patent generally relates to, *inter alia*, a novel method of interference fixation.

### COUNT I
### (DIRECT INFRINGEMENT OF U.S. PATENT 5,993,451 BY SMITH & NEPHEW)

68.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

69.     The '451 patent remains valid, enforceable, and unexpired.

70.     Smith & Nephew is directly infringing and has directly infringed the '451 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a surgical instrument and/or surgical instrument assembly for installing a suture anchor into bone covered by at least one claim of the '451 patent, including, but not limited to, Smith & Nephew's Inline Drill Guide - Fishmouth Tip.

71.     Smith & Nephew's infringement of the '451 patent is and has been willful and deliberate.

10

72.     Smith & Nephew has knowledge of the '451 patent and that its actions infringed the '451 patent at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '451 patent. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this meeting.

73.     Smith & Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding, General Counsel for Arthrex, sent a letter to Mr. Mark Gorman, Associate General Counsel for Smith & Nephew, informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '451 patent. [June 10, 2015 Letter from J. Schmieding, attached as Exhibit 14]. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this letter.

74.     Smith and Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent at least based on Arthrex's previous filing and service of a lawsuit against Smith & Nephew in the Eastern District of Texas alleging infringement of the '451 patent by Smith & Nephew (*Arthrex, Inc. v. Smith & Nephew, Inc.*, Case No. 2:14-cv-00213-JRG) (hereinafter "the previous E.D. Texas Complaint"). The previous E.D. Texas Complaint was dismissed without prejudice.

75.     Upon information and belief, Smith & Nephew also has knowledge of patents related to the drill guide industry in general and would be aware of the '451 patent. Upon information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly

available    notices    on    Arthrex's    website.    [See    e.g.    Printout    of https://www.arthrex.com/corporate/virtual-patent-marking, attached as Exhibit 15].

76.    Upon information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See, e.g., Arthrex's, "The Next Generation in Shoulder Repair Technology," 2010, attached as Exhibit 16].

77.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, the previous E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small drill guide market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

78.    Smith & Nephew knew of the '451 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

79.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

<u>COUNT II</u>
**(INDUCED INFRINGEMENT OF U.S. PATENT 5,993,451 BY SMITH & NEPHEW)**

80.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

81.    The '451 patent remains valid, enforceable, and unexpired.

82.    With knowledge of the '451 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '451 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a surgical instrument and/or surgical instrument assembly for installing a suture anchor into bone covered by the '451 patent, including, but not limited to, Smith & Nephew's Inline Drill Guide - Fishmouth Tip, for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '451 patent by making and/or using Smith & Nephew's Inline Drill Guide - Fishmouth Tip in their surgeries thereby reading on at least one claim of the '451 patent.

83.    Smith & Nephew specifically intended its customers to infringe the '451 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the existence of the '451 patent and/or the fact that surgeons' use of Smith & Nephew's Inline Drill Guide - Fishmouth Tip would directly infringe the '451 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '451 patent, Smith & Nephew marketed and sold its Inline Drill Guide - Fishmouth Tip to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '451 patent by performing surgery following the instructions for use and other instructional literature and information prepared and provided by Smith & Nephew for its Inline Drill Guide - Fishmouth

13

Tip. These materials are publicly available and/or provided with Smith & Nephew's Inline Drill Guide - Fishmouth Tip.

84.      Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '451 patent. Smith & Nephew has knowledge of the '451 patent and its infringement of the '451 patent, or willfully blinded itself to such knowledge, at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '451 patent. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this meeting.

85.      Smith & Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '451 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this letter.

86.      Smith and Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '451 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

87.      Upon information and belief, Smith & Nephew also has knowledge of patents related to the drill guide industry in general and would be aware of the '451 patent. Upon

14

information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

88.     Upon information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

89.     Upon information and belief, Smith & Nephew has not made any changes to Smith & Nephew's Inline Drill Guide - Fishmouth Tip despite its knowledge of the '451 patent.

90.     Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature despite its knowledge of the '451 patent.

91.     At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman, the previous E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, its knowledge that Arthrex is a direct competitor in the relatively small drill guide market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '451 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '451 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '451 patent resulting from the surgeons' use of Smith & Nephew's Inline Drill Guide - Fishmouth Tip.

92.     Smith & Nephew knew of the '451 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known

of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

93.      As a result, Smith & Nephew's infringement of the '451 patent is and has been willful and deliberate.

94.      Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

### COUNT III
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 5,993,451 BY SMITH & NEPHEW)

95.      Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

96.      The '451 patent remains valid, enforceable, and unexpired.

97.      With knowledge of the '451 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '451 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a surgical instrument and/or surgical instrument assembly for installing a suture anchor into bone, including, but not limited to, Smith & Nephew's Inline Drill Guide - Fishmouth Tip, for use by its orthopedic surgeon customers. These orthopedic surgeon customers directly infringe the '451 patent by making and/or using Smith & Nephew's Smith & Nephew's Inline Drill Guide - Fishmouth Tip in their surgeries thereby reading on at least one claim of the '451 patent.

16

98.     Smith & Nephew specifically contributed to its customers' infringement of the '451 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's Inline Drill Guide - Fishmouth Tip would directly infringe the '451 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '451 patent, Smith & Nephew marketed and sold its Inline Drill Guide - Fishmouth Tip to orthopedic surgeon customers for use in their surgeries. These orthopedic surgeons directly infringe the '451 patent by making and/or using Smith & Nephew's Inline Drill Guide - Fishmouth Tip assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for its Inline Drill Guide - Fishmouth Tip. These materials are publicly available and/or provided with Smith & Nephew's Inline Drill Guide - Fishmouth Tip.

99.     Smith & Nephew's Inline Drill Guide - Fishmouth Tip has no substantial, non-infringing uses for at least the reason that Smith & Nephew's Inline Drill Guide - Fishmouth Tip can only be used to directly infringe the '451 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its Inline Drill Guide - Fishmouth Tip, these assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

100.    Smith & Nephew's Inline Drill Guide - Fishmouth Tip constitutes a material part of the invention of the '451 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '451 patent. The surgeries Smith & Nephew promotes through its instructional materials require the making and/or use of Smith & Nephew's Inline Drill Guide - Fishmouth Tip thereby reading on at least one claim of the '451 patent.

101.    Smith & Nephew knew and/or knows that its Inline Drill Guide - Fishmouth Tip is especially made or especially adapted for use in an infringement of at least one claim of the '451 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using its Inline Drill Guide - Fishmouth Tip, including the instructions for use for these products, promotes making and/or using the Inline Drill Guide - Fishmouth Tip thereby reading on at least one claim of the '451 patent.

102.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '451 patent. Smith & Nephew has knowledge of the '451 patent and its infringement of the '451 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '451 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this letter.

103.    Smith & Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent as a result of the meeting on or about March 12, 2014 where Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '451 patent. At a minimum, Smith & Nephew was aware of the '451 patent and the infringement of the '451 patent as a result of this meeting.

104.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '451 patent. Upon information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

18

105.     Upon information and belief, Smith & Nephew also has knowledge of the '451 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

106.     Smith and Nephew also has knowledge of the '451 patent and that its actions infringed the '451 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '451 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

107.     Upon information and belief, Smith & Nephew has not made any changes to its Inline Drill Guide - Fishmouth Tip despite its knowledge of the '451 patent.

108.     Upon information and belief, Smith & Nephew has not made any changes to its publicly available instructional product literature, including the instructions for use, for its Inline Drill Guide - Fishmouth Tip despite its knowledge of the '451 patent.

109.     At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the meeting between Mr. Schmieding and Mr. Campo, the previous E.D. Texas Complaint, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '451 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '451 patent, and therefore willfully blinded itself to surgeons' direct

infringement of the '451 patent resulting from the surgeons' use of Smith & Nephew's Inline Drill Guide - Fishmouth Tip.

110.     Smith & Nephew knew of the '451 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

111.     As a result, Smith & Nephew's infringement of the '451 patent is and has been willful and deliberate.

112.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT IV
## (DIRECT INFRINGEMENT OF U.S. PATENT 8,343,186 BY SMITH & NEPHEW)

113.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

114.     The '186 patent remains valid, enforceable, and unexpired.

115.     Smith & Nephew is directly infringing and has directly infringed the '186 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '186 patent, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, Spartan Suture Anchor assemblies, and/or SpeedFix Suture Implant assemblies.

20

116.    Smith & Nephew's infringement of the '186 patent is and has been willful and deliberate.

117.    Smith & Nephew has knowledge of the '186 patent and that its actions infringed the '186 patent at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '186 patent. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this meeting.

118.    Smith & Nephew also has knowledge of the '186 patent and that its actions infringed the '186 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

119.    Smith and Nephew also has knowledge of the '186 patent and that its actions infringed the '186 patent at least based on Arthrex's filing and service of the previous E.D. Texas Complaint. The previous E.D. Texas Complaint was dismissed without prejudice.

120.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15 and Printout of https://www.arthrex.com/knee/corkscrew-ft/products, attached as Exhibit 17].

21

121.    Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Arthrex's, "The Next Generation in Shoulder & Elbow Repair and Reconstruction Technology," 2014, attached as Exhibit 18].

122.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, the previous E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

123.    Smith & Nephew knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

124.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT V
### (INDUCED INFRINGEMENT OF U.S. PATENT 8,343,186 BY SMITH & NEPHEW)

125.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

126.    The '186 patent remains valid, enforceable, and unexpired.

127.    With knowledge of the '186 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '186 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '186 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '186 patent.

128.    Smith & Nephew specifically intended its customers to infringe the '186 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '186 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '186 patent, Smith &

Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '186 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

129.    Smith & Nephew has knowledge of the '186 patent and that its actions infringed the '186 patent as a result of the meeting on or about March 12, 2014 where Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '186 patent. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this meeting.

130.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '186 patent. Smith & Nephew has knowledge of the '186 patent and its

infringement of the '186 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

131.    Smith and Nephew also has knowledge of the '186 patent and that its actions infringed the '186 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '186 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

132.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 17].

133.    Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 18].

134.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

135.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

136.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the meeting between Mr. Schmieding and Mr. Campo, the previous E.D. Texas Complaint, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '186 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '186 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '186 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

137.    Smith & Nephew knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known

26

of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

138.    As a result, Smith & Nephew's infringement of the '186 patent is and has been willful and deliberate.

139.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT VI
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,343,186 BY SMITH & NEPHEW)

140.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

141.    The '186 patent remains valid, enforceable, and unexpired.

142.    With knowledge of the '186 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '186 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, for use by its orthopedic surgeon customers. These orthopedic surgeon customers directly infringe the '186 patent by inserting surgical suture into and/or using

27

Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '186 patent.

143.     Smith & Nephew specifically contributed to its customers' infringement of the '186 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '186 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '186 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeon customers for use in their surgeries. These orthopedic surgeons directly infringe the '186 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other

instructional literature and/or information prepared and provided by Smith & Nephew for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

144. Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '186 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant

assemblies, and/or Spartan Suture Anchor assemblies, these assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

145.    Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies constitutes a material part of the invention of the '186 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '186 patent. The surgeries Smith & Nephew promotes through its instructional materials require the disposal of surgical suture into and/or use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies thereby reading on at least one claim of the '186 patent.

146.    Smith & Nephew knew and/or knows that its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '186 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti

Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, including the instructions for use for these assemblies, promotes disposing surgical suture into and/or using these suture anchor assemblies thereby reading on at least one claim of the '186 patent.

147.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '186 patent. Smith & Nephew has knowledge of the '186 patent and its infringement of the '186 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

148.    Smith & Nephew also has knowledge of the '186 patent and that its actions infringed the '186 patent as a result of the meeting on or about March 12, 2014 where Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '186 patent. At a minimum, Smith & Nephew was aware of the '186 patent and the infringement of the '186 patent as a result of this meeting.

149.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 17].

150.    Smith and Nephew also has knowledge of the '186 patent and that its actions infringed the '186 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '186 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

151.    Upon information and belief, Smith & Nephew also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 18].

152.    Upon information and belief, Smith & Nephew has not made any changes to any of its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

153.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

154.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the meeting between Mr. Schmieding and Mr. Campo, the previous E.D. Texas Complaint, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor

market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '186 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '186 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '186 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

155.    Smith & Nephew knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

156.    As a result, Smith & Nephew's infringement of the '186 patent is and has been willful and deliberate.

157.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT VII
### (DIRECT INFRINGEMENT OF U.S. PATENT 8,343,186 BY ARTHROCARE)

158.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

159.    The '186 patent remains valid, enforceable, and unexpired.

160.    ArthroCare is directly infringing and has directly infringed the '186 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '186 patent, including, but not limited to, ArthroCare's Titan Ti Suture Implant assemblies, Spartan Suture Anchor assemblies and/or SpeedFix Suture Implant assemblies.

161.    ArthroCare's infringement of the '186 patent is and has been willful and deliberate.

162.    ArthroCare has knowledge of the '186 patent and that its actions infringed the '186 patent based at least on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

163.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 17].

164.    Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those

relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 18].

165.   At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, ArthroCare's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement.

166.   ArthroCare knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

167.   Arthrex and ArthroCare are competitors. Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of ArthroCare's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT VIII
### (INDUCED INFRINGEMENT U.S. PATENT 8,343,186 BY ARTHROCARE)

168.   Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

169.   The '186 patent remains valid, enforceable, and unexpired.

170.   With knowledge of the '186 patent, ArthroCare has induced and continues to induce the infringement of at least one claim of the '186 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture

Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of ArthroCare's inducement, these orthopedic surgeon customers directly infringe the '186 patent by making and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies with surgical suture in their surgeries thereby reading on at least one claim of the '186 patent.

171.   ArthroCare specifically intended its customers to infringe the '186 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '186 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '186 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '186 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies while following the instructions for use and other instructional

literature and/or information prepared and provided by ArthroCare for ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies.

172.   ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '186 patent. ArthroCare has knowledge of the '186 patent and its infringement of the '186 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

173.   Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 17].

174.   Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 18].

175.    Upon information and belief, ArthroCare has not made any changes to any of its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

176.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

177.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '186 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '186 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '186 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

178.    ArthroCare knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this

likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

179.    As a result, ArthroCare's infringement of the '186 patent is and has been willful and deliberate.

180.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT IX
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,343,186 BY ARTHROCARE)

181.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

182.    The '186 patent remains valid, enforceable, and unexpired.

183.    With knowledge of the '186 patent, ArthroCare has contributed and continues to contribute to the infringement of at least one claim of the '186 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. These orthopedic surgeon customers directly infringe the '186 patent by using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or

39

Spartan Suture Anchor assemblies with surgical suture in their surgeries thereby reading on at least one claim of the '186 patent.

184.    ArthroCare specifically contributed to its customers' infringement of the '186 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '186 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '186 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '186 patent by inserting surgical suture into, and/or using, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant

assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

185.     Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '186 patent. In other words, when ArthroCare's instructions and directions are followed to dispose surgical suture in the implant assembly and/or use the implant assembly, ArthroCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are only used in an infringing manner, and are only advertised by ArthroCare for such an infringing use.

186.     Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies constitutes a material part of the invention of the '186 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '186 patent. The surgeries ArthroCare promotes through its instructional materials require the disposal of surgical suture into and/or use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless

Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies thereby reading on at least one claim of the '186 patent.

187.    ArthroCare knew and/or knows that its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '186 patent for at least the reason that the publicly available literature and information ArthroCare provides, endorses, and promotes for using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies with surgical suture, including the instructions for use for these assemblies, promotes disposing surgical suture into and/or using these suture anchor assemblies thereby reading on at least one claim of the '186 patent.

188.    ArthroCare knew and/or knows that the surgeons' actions, when performed, would directly infringe the '186 patent. ArthroCare has knowledge of the '186 patent and its infringement of the '186 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '186 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '186 patent and the infringement of the '186 patent as a result of this letter.

189.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '186 patent. Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 17].

190.    Upon information and belief, ArthroCare also has knowledge of the '186 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 18].

191.    Upon information and belief, ArthroCare has not made any changes to any of its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

192.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '186 patent.

193.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '186 patent by its surgeon customers, yet deliberately avoided confirming

that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '186 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '186 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

194.    ArthroCare knew of the '186 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

195.    As a result, ArthroCare's infringement of the '186 patent is and has been willful and deliberate.

196.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT X
### (DIRECT INFRINGEMENT OF U.S. PATENT 8,623,052 BY SMITH & NEPHEW)

197.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

198.    The '052 patent remains valid, enforceable, and unexpired.

199.    Smith & Nephew is directly infringing and has directly infringed the '052 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing,

without license or authority, a suture anchor assembly covered by at least one claim of the '052 patent, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, and/or Spartan Suture Anchor assemblies.

200.    Smith & Nephew's infringement of the '052 patent is and has been willful and deliberate.

201.    Smith & Nephew has knowledge of the '052 patent and that its actions infringed the '052 patent at the very least based on a meeting between Mr. John Schmieding, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '052 patent. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this meeting.

202.    Smith & Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

203.    Smith and Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent at least based on Arthrex's filing and service of the previous E.D. Texas Complaint. The previous E.D. Texas Complaint was dismissed without prejudice.

204.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, Smith & Nephew also has knowledge of the '052 patent because it is a continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

205.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, the previous E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

206.    Smith & Nephew knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

207.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XI
### (INDUCED INFRINGEMENT OF U.S. PATENT 8,623,052 BY SMITH & NEPHEW)

208.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

46

209.     The '052 patent remains valid, enforceable, and unexpired.

210.     With knowledge of the '052 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '052 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '052 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '052 patent.

211.     Smith & Nephew specifically intended its customers to infringe the '052 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '052 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '052 patent, Smith &

Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '052 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

212.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '052 patent. Smith & Nephew has knowledge of the '052 patent and its infringement of the '052 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to

48

Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

213.    Smith & Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent as a result of the meeting on or about March 12, 2014 where Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '052 patent. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this meeting.

214.    Smith and Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '052 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

215.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, Smith & Nephew also has knowledge of the '052 patent because it is a continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

216.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock

Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

217.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

218.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the meeting between Mr. Schmieding and Mr. Campo, the previous E.D. Texas Complaint, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '052 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '052 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '052 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

219.    Smith & Nephew knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

220.    As a result, Smith & Nephew's infringement of the '052 patent is and has been willful and deliberate.

221.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XII
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,623,052 BY SMITH & NEPHEW)

222.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

223.    The '052 patent remains valid, enforceable, and unexpired.

224.    With knowledge of the '052 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '052 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan

Suture Anchor assemblies, for use by its orthopedic surgeon customers. These orthopedic surgeon customers directly infringe the '052 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '052 patent.

225.    Smith & Nephew specifically contributed to its customers' infringement of the '052 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '052 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '052 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '052 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies,

SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

226.    Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '052 patent. In other words, when Smith & Nephew's instructions and directions are followed to dispose surgical suture in the implant assemblies and/or use the implant assemblies, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies,

Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, these assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

227.    Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies constitutes a material part of the invention of the '052 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '052 patent. The surgeries Smith & Nephew promotes through its instructional materials require the disposal of surgical suture into and/or use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies thereby reading on at least one claim of the '052 patent.

228.    Smith & Nephew knew and/or knows that its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '052 patent for at least the reason that the publicly

available literature and information Smith & Nephew provides, endorses, and promotes for using its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, including the instructions for use for these assemblies, promotes disposing surgical suture into and/or using these suture anchor assemblies thereby reading on at least one claim of the '052 patent.

229.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '052 patent. Smith & Nephew has knowledge of the '052 patent and its infringement of the '052 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

230.    Smith & Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent as a result of the meeting on or about March 12, 2014 where Mr. Schmieding informed Mr. Campo of certain Arthrex patents that Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '052 patent. At a minimum, Smith & Nephew was aware of the '052 patent and the infringement of the '052 patent as a result of this meeting.

231.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, Smith & Nephew also has knowledge of the '052 patent because it is a

continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

232.    Smith and Nephew also has knowledge of the '052 patent and that its actions infringed the '052 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '052 patent. The previous E.D. Texas Complaint was dismissed without prejudice.

233.    Upon information and belief, Smith & Nephew has not made any changes to any of its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

234.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

235.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the meeting between Mr. Schmieding and Mr. Campo, the previous E.D. Texas Complaint, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its

56

acts, if taken, would result in direct infringement of the '052 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '052 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '052 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

236.    Smith & Nephew knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

237.    As a result, Smith & Nephew's infringement of the '052 patent is and has been willful and deliberate.

238.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XIII
### (DIRECT INFRINGEMENT OF U.S. PATENT 8,623,052 BY ARTHROCARE)

239.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

240.    The '052 patent remains valid, enforceable, and unexpired.

57

241.    ArthroCare is directly infringing and has directly infringed the '052 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '052 patent, including, but not limited to, ArthroCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, and/or Spartan Suture Anchor assemblies.

242.    ArthroCare's infringement of the '052 patent is and has been willful and deliberate.

243.    ArthroCare has knowledge of the '052 patent and that its actions infringed the '052 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

244.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, ArthroCare also has knowledge of the '052 patent because it is a continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

245.    At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, ArthroCare's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement.

246.    ArthroCare knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

247.    Arthrex and ArthroCare are competitors.   Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of ArthroCare's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

### COUNT XIV
### (INDUCED INFRINGEMENT OF U.S. PATENT 8,623,052 BY ARTHROCARE)

248.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

249.    The '052 patent remains valid, enforceable, and unexpired.

250.    With knowledge of the '052 patent, ArthroCare has induced and continues to induce the infringement of at least one claim of the '052 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of ArthroCare's inducement, these orthopedic surgeon customers directly infringe the '052 patent by making and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock

Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies with surgical suture in their surgeries thereby reading on at least one claim of the '052 patent.

251.     ArthroCare specifically intended its customers to infringe the '052 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '052 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '052 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '052 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant

assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

252.     ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '052 patent. ArthroCare has knowledge of the '052 patent and its infringement of the '052 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

253.     Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, ArthroCare also has knowledge of the '052 patent because it is a continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

254.     Upon information and belief, ArthroCare has not made any changes to any of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

255.     Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock

Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

256.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '052 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '052 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '052 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

257.    ArthroCare knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

258.    As a result, ArthroCare's infringement of the '052 patent is and has been willful and deliberate.

259.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex

outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

<u>COUNT XV</u>
**(CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,623,052 BY ARTHROCARE)**

260.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

261.    The '052 patent remains valid, enforceable, and unexpired.

262.    With knowledge of the '052 patent, ArthroCare has contributed and continues to contribute to the infringement of at least one claim of the '052 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, for use by its orthopedic surgeon customers.

263.    ArthroCare markets and sells its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies to orthopedic surgeons who use ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '052 patent.

264.    ArthroCare specifically contributed to its customers' infringement of the '052 patent and knew that its customers' acts constituted infringement, or at the very least, was

willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '052 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '052 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '052 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

265.   Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor

assemblies has no substantial, non-infringing uses for at least the reason that each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '052 patent. In other words, when ArthroCare's instructions and directions are followed to use these assemblies, they are only used in an infringing manner, and are only advertised by ArthroCare for such an infringing use.

266.    Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies constitutes a material part of the invention of the '052 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '052 patent. The surgeries ArthroCare promotes through its instructional materials require the use of ArthroCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies with surgical suture thereby reading on at least one claim of the '052 patent.

267.    ArthroCare knew and/or knows that its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '052 patent for at least the reason that the publicly available literature and information ArthroCare provides, endorses, and promotes for using ArthroCare's Titan Ti

65

Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, including the instructions for use, promotes disposing surgical suture into and/or using these suture anchor assemblies thereby reading on at least one claim of the '052 patent.

268.    ArthroCare knew and/or knows that the surgeons' actions, when performed, would directly infringe the '052 patent. ArthroCare has knowledge of the '052 patent and its infringement of the '052 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '052 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '052 patent and the infringement of the '052 patent as a result of this letter.

269.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '052 patent. Upon information and belief, ArthroCare also has knowledge of the '052 patent because it is a continuation of the '186 patent, and because the '052 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

270.    Upon information and belief, ArthroCare has not made any changes to any of its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

271.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its Titan

Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '052 patent.

272.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '052 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '052 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '052 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

273.    ArthroCare knew of the '052 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

274.    As a result, ArthroCare's infringement of the '052 patent is and has been willful and deliberate.

275.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that

infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XVI
## (DIRECT INFRINGEMENT OF U.S. PATENT 8,801,755 BY SMITH & NEPHEW)

276.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

277.    The '755 patent remains valid, enforceable, and unexpired.

278.    Smith & Nephew is directly infringing and has directly infringed the '755 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '755 patent, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, and/or Spartan Suture Anchor assemblies.

279.    Smith & Nephew's infringement of the '755 patent is and has been willful and deliberate.

280.    Smith & Nephew has knowledge of the '755 patent and that its actions infringed the '755 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

281.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, Smith & Nephew also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas Complaint.

282.    At the very least,  based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

283.    Smith & Nephew knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

284.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XVII
## (INDUCED INFRINGEMENT OF U.S. PATENT 8,801,755 BY SMITH & NEPHEW)

285.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

286.    The '755 patent remains valid, enforceable, and unexpired.

287.    With knowledge of the '755 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '755 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '755 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '755 patent.

288.    Smith & Nephew specifically intended its customers to infringe the '755 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant

assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '755 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '755 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '755 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture

71

Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

289.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '755 patent. Smith & Nephew has knowledge of the '755 patent and its infringement of the '755 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

290.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, Smith & Nephew also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas Complaint.

291.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

292.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

293.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '755 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '755 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '755 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

294.    Smith & Nephew knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known

of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

295.    As a result, Smith & Nephew's infringement of the '755 patent is and has been willful and deliberate.

296.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

**COUNT XVIII**
**(CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,801,755 BY SMITH & NEPHEW)**

297.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

298.    The '755 patent remains valid, enforceable, and unexpired.

299.    With knowledge of the '755 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '755 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, for use with surgical suture by its orthopedic surgeon customers.

300.    Smith & Nephew markets and sells its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons who use Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '755 patent.

301.    Smith & Nephew specifically contributed to its customers' infringement of the '755 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '755 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '755 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies,

75

SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '755 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

302.   Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant

assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '755 patent. In other words, when Smith & Nephew's instructions and directions are followed to dispose surgical suture in the implant and/or use the implant, Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, these assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

303. Each of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies constitutes a material part of the invention of the '755 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least

one claim of the '755 patent. The surgeries Smith & Nephew promotes through its instructional materials require the disposal of surgical suture into and/or use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies thereby reading on at least one claim of the '755 patent.

304.    Smith & Nephew knew and/or knows that its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '755 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, including the instructions for use for these assemblies, promotes disposing surgical suture into and/or using these suture anchor assemblies thereby reading on at least one claim of the '755 patent.

305.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '755 patent. Smith & Nephew has knowledge of the '755 patent and its infringement of the '755 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

306.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, Smith & Nephew also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas Complaint.

307.    Upon information and belief, Smith & Nephew has not made any changes to any of its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

308.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant

assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

309.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '755 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '755 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '755 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchor assemblies, HEALICOIL Suture Anchor assemblies, TwinFix PK FT Suture Anchor assemblies, Spyromite Suture Anchor assemblies, Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

310.    Smith & Nephew knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

311.    As a result, Smith & Nephew's infringement of the '755 patent is and has been willful and deliberate.

312.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XIX
## (DIRECT INFRINGEMENT OF U.S. PATENT 8,801,755 BY ARTHROCARE)

313.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

314.     The '755 patent remains valid, enforceable, and unexpired.

315.     ArthroCare is directly infringing and has directly infringed the '755 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '755 patent, including, but not limited to, ArthroCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, and/or Spartan Suture Anchor assemblies.

316.     ArthroCare's infringement of the '755 patent is and has been willful and deliberate.

317.     ArthroCare has knowledge of the '755 patent and that its actions infringed the '755 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

318.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, ArthroCare also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

319.    At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, ArthroCare's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement.

320.    ArthroCare knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

321.    Arthrex and ArthroCare are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of ArthroCare's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XX
## (INDUCED INFRINGEMENT OF U.S. PATENT 8,801,755 BY ARTHROCARE)

322.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

323.    The '755 patent remains valid, enforceable, and unexpired.

82

324.    With knowledge of the '755 patent, ArthroCare has induced and continues to induce the infringement of at least one claim of the '755 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of ArthroCare's inducement, these orthopedic surgeon customers directly infringe the '755 patent by making and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies with surgical suture in their surgeries thereby reading on at least one claim of the '755 patent.

325.    ArthroCare specifically intended its customers to infringe the '755 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '755 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '755 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '755 patent by

inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

326.    ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '755 patent. ArthroCare has knowledge of the '755 patent and its infringement of the '755 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

327.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, ArthroCare also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

328.    Upon information and belief, ArthroCare has not made any changes to any of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

329.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

330.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '755 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '755 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '755 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

331.     ArthroCare knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

332.     As a result, ArthroCare's infringement of the '755 patent is and has been willful and deliberate.

333.     Arthrex and ArthroCare are competitors.  As a result of ArthroCare's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXI
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,801,755 BY ARTHROCARE)

334.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

335.     The '755 patent remains valid, enforceable, and unexpired.

336.     With knowledge of the '755 patent, ArthroCare has contributed and continues to contribute to the infringement of at least one claim of the '755 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies for use by its orthopedic surgeon customers.

337.    ArthroCare markets and sells its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons who use ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '755 patent.

338.    ArthroCare specifically contributed its customers infringement the '755 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies would directly infringe the '755 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '755 patent, ArthroCare marketed and sold its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '755 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies following the instructions for use and other instructional literature

and/or information prepared and provided by ArthroCare for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies.

339.    Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies can only be used to directly infringe the '755 patent. In other words, when ArthroCare's instructions and directions are followed to dispose surgical suture in the implant and/or the use the implant, ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are only used in an infringing manner, and are only advertised by ArthroCare for such an infringing use.

340.    Each of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor

assemblies constitutes a material part of the invention of the '755 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '755 patent. The surgeries ArthroCare promotes through its instructional materials require the use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies with surgical suture thereby reading on at least one claim of the '755 patent.

341.    ArthroCare knew and/or knows that its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '755 patent for at least the reason that the publicly available literature and information ArthroCare provides, endorses, and promotes for using ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies, including the instructions for use for these assemblies, promotes using these assemblies thereby reading on at least one claim of the '755 patent.

342.    ArthroCare knew and/or knows that the surgeons' actions, when performed, would directly infringe the '755 patent. ArthroCare has knowledge of the '755 patent and its infringement of the '755 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to

Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '755 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '755 patent and the infringement of the '755 patent as a result of this letter.

343.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '755 patent. Upon information and belief, ArthroCare also has knowledge of the '755 patent because it is a continuation of the '186 patent, and because the '755 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

344.    Upon information and belief, ArthroCare has not made any changes to any of its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

345.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies, and/or Spartan Suture Anchor assemblies despite its knowledge of the '755 patent.

346.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '755 patent by its surgeon customers, yet deliberately avoided confirming

that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '755 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '755 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implant assemblies, SpeedFix Suture Implant assemblies, SpeedScrew Knotless Implant assemblies, SpeedLock Knotless Implant assemblies, SpeedLock Hip Knotless Implant assemblies and/or Spartan Suture Anchor assemblies.

347.    ArthroCare knew of the '755 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

348.    As a result, ArthroCare's infringement of the '755 patent is and has been willful and deliberate.

349.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXII
## (DIRECT INFRINGEMENT OF U.S. PATENT 8,821,541 BY SMITH & NEPHEW)

350.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

351.    The '541 patent remains valid, enforceable, and unexpired.

352.    Smith & Nephew is directly infringing and has directly infringed the '541 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing,

91

without license or authority, suture anchors and suture anchor assemblies covered by at least one claim of the '541 patent, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, and/or Spartan Suture Anchors and Suture Anchor assemblies.

353.   Smith & Nephew's infringement of the '541 patent is and has been willful and deliberate.

354.   Smith & Nephew also has knowledge of the '541 patent and that its actions infringed the '541 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

355.   Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, Smith & Nephew also has knowledge of the '541 patent because it is a continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas complaint.

356.   At the very least,  based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that

Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

357.    Smith & Nephew knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

358.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXIII
### (INDUCED INFRINGEMENT OF U.S. PATENT 8,821,541 BY SMITH & NEPHEW)

359.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

360.    The '541 patent remains valid, enforceable, and unexpired.

361.    With knowledge of the '541 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '541 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchors and suture anchor assemblies including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies,

SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '541 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies in their surgeries thereby reading on at least one claim of the '541 patent.

362.    Smith & Nephew specifically intended its customers to infringe the '541 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies would directly infringe the '541 patent. Despite a high likelihood that its actions would induce its

surgeon customers' direct infringement of the '541 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '541 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these products. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and

Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

363.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '541 patent. Smith & Nephew has knowledge of the '541 patent and its infringement of the '541 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

364.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, Smith & Nephew also has knowledge of the '541 patent because it is a continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas Complaint.

365.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies

and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

366.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

367.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '541 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '541 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '541 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite

Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

368.     Smith & Nephew knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

369.     As a result, Smith & Nephew's infringement of the '541 patent is and has been willful and deliberate.

370.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXIV
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,821,541 BY SMITH & NEPHEW)

371.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

372.     The '541 patent remains valid, enforceable, and unexpired.

373.     With knowledge of the '541 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '541 patent under 35

U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchors and suture anchor assemblies, including, but not limited to, Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies, for use with surgical suture by its orthopedic surgeon customers.

374.    Smith & Nephew markets and sells its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons who use these suture anchors and suture anchor assemblies in their surgeries thereby reading on at least one claim of the '541 patent.

375.    Smith & Nephew specifically contributed to its customers' infringement of the '541 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture

Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies would directly infringe the '541 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '541 patent, Smith & Nephew marketed and sold its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '541 patent by inserting surgical suture into and/or using Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors and suture anchor assemblies. These materials are

100

publicly available and/or provided with Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

376.    Each of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies can only be used to directly infringe the '541 patent. In other words, when Smith & Nephew's instructions and directions are followed to dispose surgical suture in

the suture anchors and suture anchor assemblies and/or use the suture anchor and suture anchor assemblies, Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies, these suture anchors and suture anchor assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

377.    Each of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies constitutes a material part of the invention of the '541 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '541 patent. The surgeries Smith & Nephew promotes through its instructional materials require the disposal of surgical suture and/or use of these suture anchors and suture anchor assemblies thereby reading on at least one claim of the '541 patent.

378.    Smith & Nephew knew and/or knows that its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '541 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these suture anchors and suture anchor assemblies, including the instructions for use for these products, promotes disposing surgical suture into and/or using these anchors and assemblies thereby reading on at least one claim of the '541 patent.

379.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '541 patent. Smith & Nephew has knowledge of the '541 patent and its infringement of the '541 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

380.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, Smith & Nephew also has knowledge of the '541 patent because it is a

continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15]. Arthrex also accused Smith & Nephew of infringing the '186 patent in the previous E.D. Texas Complaint.

381.    Upon information and belief, Smith & Nephew has not made any changes to any of its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

382.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

383.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor

market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '541 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '541 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '541 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ultra Suture Anchors and Suture Anchor assemblies, HEALICOIL Suture Anchors and Suture Anchor assemblies, TwinFix PK FT Suture Anchors and Suture Anchor assemblies, Spyromite Suture Anchors and Suture Anchor assemblies, Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

384.    Smith & Nephew knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

385.    As a result, Smith & Nephew's infringement of the '541 patent is and has been willful and deliberate.

386.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The

threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXV
## (DIRECT INFRINGEMENT OF U.S. PATENT 8,821,541 BY ARTHROCARE)

387.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

388.    The '541 patent remains valid, enforceable, and unexpired.

389.    ArthroCare is directly infringing and has directly infringed the '541 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority,  suture anchors and suture anchor assemblies covered by at least one claim of the '541 patent, including, but not limited to, ArthroCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, and/or Spartan Suture Anchors and Suture Anchor assemblies.

390.    ArthroCare's infringement of the '541 patent is and has been willful and deliberate.

391.    ArthroCare has knowledge of the '541 patent and that its actions infringed the '541 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

392. Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, ArthroCare also has knowledge of the '541 patent because it is a continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

393. At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, ArthroCare's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement.

394. ArthroCare knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

395. Arthrex and ArthroCare are competitors. Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of ArthroCare's infringement, unless that infringement is enjoined by this Court. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXVI
## (INDUCED INFRINGEMENT OF U.S. PATENT 8,821,541 BY ARTHROCARE)

396. Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

397. The '541 patent remains valid, enforceable, and unexpired.

398.    With knowledge of the '541 patent, ArthroCare has induced and continues to induce the infringement of at least one claim of the '541 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, suture anchors and/or suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies for use by its orthopedic surgeon customers. In light of ArthroCare's inducement, these orthopedic surgeon customers directly infringe the '541 patent by making and/or using ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies with surgical suture in their surgeries thereby reading on at least one claim of the '541 patent.

399.    ArthroCare specifically intended its customers to infringe the '541 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies would directly infringe the '541 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '541 patent, ArthroCare marketed and sold its

Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '541 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

400.    ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '541 patent. ArthroCare has knowledge of the '541 patent and its infringement of the '541 patent, or willfully blinded itself to such knowledge, at the very least based on

communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

401.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, ArthroCare also has knowledge of the '541 patent because it is a continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

402.    Upon information and belief, ArthroCare has not made any changes to any of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

403.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

404.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '541 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '541 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '541 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

405.    ArthroCare knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

406.    As a result, ArthroCare's infringement of the '541 patent is and has been willful and deliberate.

407.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex

outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXVII
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 8,821,541 BY ARTHROCARE)

408.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

409.    The '541 patent remains valid, enforceable, and unexpired.

410.    With knowledge of the '541 patent, ArthroCare has contributed and continues to contribute to the infringement of at least one claim of the '541 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, suture anchors and/or suture anchor assemblies, including, but not limited to, ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies, for use by its orthopedic surgeon customers.

411.    ArthroCare markets and sells its Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons who use these ArthroCare products in their surgeries thereby reading on at least one claim of the '541 patent.

412.    ArthroCare specifically contributed to its customers' infringement of the '541 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthoCare's Titan Ti Suture Implants and Suture

Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies would directly infringe the '541 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '541 patent, ArthroCare marketed and sold its Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '541 patent by inserting surgical suture into and/or using ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for these products. These materials are publicly available and/or provided with ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

413.    Each of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and

Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies has no substantial, non-infringing uses for at least the reason that each of these products can only be used to directly infringe the '541 patent. In other words, when ArthroCare's instructions and directions are followed to use the products, ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies are only used in an infringing manner, and are only advertised by ArthroCare for such an infringing use.

414.    Each of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies constitutes a material part of the invention of the '541 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '541 patent. The surgeries ArthroCare promotes through its instructional materials require the use of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies with surgical suture thereby reading on at least one claim of the '541 patent.

415.    ArthroCare knew and/or knows that its Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '541 patent for at least the reason that the publicly available literature and information ArthroCare provides, endorses, and promotes for using these products, including the instructions for use for these products, promotes using these products thereby reading on at least one claim of the '541 patent.

416.    ArthroCare knew and/or knows that the surgeons' actions, when performed, would directly infringe the '541 patent. ArthroCare has knowledge of the '541 patent and its infringement of the '541 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '541 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '541 patent and the infringement of the '541 patent as a result of this letter.

417.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '541 patent. Upon information and belief, ArthroCare also has knowledge of the '541 patent because it is a continuation-in-part of the '186 patent, and because the '541 patent is listed through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

418.    Upon information and belief, ArthroCare has not made any changes to any of its Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture

Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

419.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies, SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies despite its knowledge of the '541 patent.

420.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '541 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '541 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '541 patent resulting from the surgeons' use of ArthoCare's Titan Ti Suture Implants and Suture Implant assemblies, SpeedFix Suture Implants and Suture Implant assemblies, SpeedScrew Suture Implants and Suture Implant assemblies, SpeedLock Knotless Implants and Implant assemblies,

SpeedLock Hip Knotless Implants and Implant assemblies and/or Spartan Suture Anchors and Suture Anchor assemblies.

421.    ArthroCare knew of the '541 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

422.    As a result, ArthroCare's infringement of the '541 patent is and has been willful and deliberate.

423.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXVIII
## (DIRECT INFRINGEMENT OF U.S. PATENT 6,511,499 BY SMITH & NEPHEW)

424.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

425.    The '499 patent remains valid, enforceable, and unexpired.

426.    Smith & Nephew is directly infringing and has directly infringed the '499 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor covered by at least one claim of the '499 patent, including, but not limited to, Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors.

117

427.     Smith & Nephew's infringement of the '499 patent is and has been willful and deliberate.

428.     Smith & Nephew has knowledge of the '499 patent and that its actions infringed the '499 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '499 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '499 patent and the infringement of the '499 patent as a result of this letter.

429.     Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '499 patent. Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15 and Printout of https://www.arthrex. com/shoulder/suture-anchors/products?types=all&locales=en&taxonomy=shoulder_suture _anchors_group&time=0&sort=datedesc, attached as Exhibit 19]. Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

430.     At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, publicly available literature regarding Arthrex's patents, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

431.    Smith & Nephew knew of the '499 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

432.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.   The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXIX
## (INDUCED INFRINGEMENT OF U.S. PATENT 6,511,499 BY SMITH & NEPHEW)

433.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

434.    The '499 patent remains valid, enforceable, and unexpired.

435.    With knowledge of the '499 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '499 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a suture anchor including, but not limited to, Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '499 patent by making and/or using Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors in their surgeries thereby reading on at least one claim of the '499 patent.

436.    Smith & Nephew specifically intended its customers to infringe the '499 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully

119

blind to the fact that surgeons' use of Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors would directly infringe the '499 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '499 patent, Smith & Nephew marketed and sold its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '499 patent by making and/or using Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors. These materials are publicly available and/or provided with Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors.

437.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '499 patent. Smith & Nephew has knowledge of the '499 patent and its infringement of the '499 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '499 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '499 patent and the infringement of the '499 patent as a result of this letter.

438.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '499 patent. Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

439.    Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available Arthrex informational literature, including, but not limited to,

120

those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

440.    Upon information and belief, Smith & Nephew has not made any changes to any of its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors despite its knowledge of the '499 patent.

441.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors despite its knowledge of the '499 patent.

442.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '499 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '499 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '499 patent resulting from the surgeons' use of Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors.

443.    Smith & Nephew knew of the '499 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

444.     As a result, Smith & Nephew's infringement of the '499 patent is and has been willful and deliberate.

445.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

**COUNT XXX**
**(CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 6,511,499 BY SMITH & NEPHEW)**

446.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

447.     The '499 patent remains valid, enforceable, and unexpired.

448.     With knowledge of the '499 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '499 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a suture anchor, including, but not limited to, Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors, for use by its orthopedic surgeon customers.

449.     Smith & Nephew markets and sells its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors to orthopedic surgeons who use Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors in their surgeries thereby reading on at least one claim of the '499 patent.

450.     Smith & Nephew specifically contributed to its customers' infringement of the '499 patent and knew that its customers' acts constituted infringement, or at the very least, was

willfully blind to the fact that surgeons' use of Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors would directly infringe the '499 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '499 patent, Smith & Nephew marketed and sold its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '499 patent by using Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors. These materials are publicly available and/or provided with Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors.

451.   Each of Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors has no substantial, non-infringing uses for at least the reason that each of these suture anchors can only be used to directly infringe the '499 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors, these suture anchors are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

452.   Each of Smith & Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors constitutes a material part of the invention of the '499 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '499 patent. The surgeries Smith & Nephew promotes through its instructional materials require the use of these suture anchors thereby reading on at least one claim of the '499 patent.

453.     Smith & Nephew knew and/or knows that its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors are each especially made or especially adapted for use in an infringement of the '499 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these suture anchors, including the instructions for use for these suture anchors, promotes using these suture anchors thereby reading on at least one claim of the '499 patent.

454.     Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '499 patent. Smith & Nephew has knowledge of the '499 patent and its infringement of the '499 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '499 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '499 patent and the infringement of the '499 patent as a result of this letter.

455.     Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '499 patent. Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

456.     Upon information and belief, Smith & Nephew also has knowledge of the '499 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

457.    Upon information and belief, Smith & Nephew has not made any changes to any of its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors despite its knowledge of the '499 patent.

458.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its MINITAC Ti suture anchors and/or TwinFix Ti suture anchors despite its knowledge of the '499 patent.

459.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market,  and  its  use  of  instructional  literature  and/or  information  that  promotes  direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '499 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '499 patent, and therefore willfully blinded itself to surgeons' direct infringement  of  the  '499  patent  resulting  from  the  surgeons'  use  of  Smith  &  Nephew's MINITAC Ti suture anchors and/or TwinFix Ti suture anchors.

460.    Smith & Nephew knew of the '499 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

461.    As a result, Smith & Nephew's infringement of the '499 patent is and has been willful and deliberate.

462.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXI
## (DIRECT INFRINGEMENT OF U.S. PATENT 6,214,031 BY SMITH & NEPHEW)

463.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

464.     The '031 patent remains valid, enforceable, and unexpired.

465.     Smith & Nephew is directly infringing and has directly infringed the '031 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor covered by at least one claim of the '031 patent, including, but not limited to, Smith & Nephew's TwinFix Ti suture anchors.

466.     Smith & Nephew's infringement of the '031 patent is and has been willful and deliberate.

467.     Smith & Nephew also has knowledge of the '031 patent and that its actions infringed the '031 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '031 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '031 patent and the infringement of the '031 patent as a result of this letter.

468.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '031 patent. Upon information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

469.    Upon information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

470.    At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, publicly available literature regarding Arthrex's patents, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

471.    Smith & Nephew knew of the '031 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

472.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXII
## (INDUCED INFRINGEMENT OF U.S. PATENT 6,214,031 BY SMITH & NEPHEW)

473.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

474.    The '031 patent remains valid, enforceable, and unexpired.

475.    With knowledge of the '031 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '031 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a suture anchor including, but not limited to, Smith & Nephew's TwinFix Ti suture anchors for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '031 patent by making and/or using Smith & Nephew's TwinFix Ti suture anchors in their surgeries thereby reading on at least one claim of the '031 patent.

476.    Smith & Nephew specifically intended its customers to infringe the '031 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ti suture anchors would directly infringe the '031 patent.  Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '031 patent, Smith & Nephew marketed and sold its TwinFix Ti suture anchors to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '031 patent by making and/or using Smith & Nephew's TwinFix Ti suture anchors following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ti suture anchors.

477.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '031 patent. Smith & Nephew has knowledge of the '031 patent and its infringement of the '031 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '031 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '031 patent and the infringement of the '031 patent as a result of this letter.

478.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '031 patent. Upon information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

479.    Upon information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

480.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's TwinFix Ti suture anchors despite its knowledge of the '031 patent.

481.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's TwinFix Ti suture anchors despite its knowledge of the '031 patent.

482.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor

market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '031 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '031 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '031 patent resulting from the surgeons' use of Smith & Nephew's TwinFix Ti suture anchors.

483.    Smith & Nephew knew of the '031 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

484.    As a result, Smith & Nephew's infringement of the '031 patent is and has been willful and deliberate.

485.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXIII
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 6,214,031 BY SMITH & NEPHEW)

486.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

487.    The '031 patent remains valid, enforceable, and unexpired.

130

488.   With knowledge of the '031 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '031 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a suture anchor, including, but not limited to, Smith & Nephew's TwinFix Ti suture anchors, for use by its orthopedic surgeon customers.

489.   Smith & Nephew markets and sells its TwinFix Ti suture anchors to orthopedic surgeons who use Smith & Nephew's TwinFix Ti suture anchors in their surgeries thereby reading on at least one claim of the '031 patent.

490.   Smith & Nephew specifically contributed to its customers' infringement of the '031 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's TwinFix Ti suture anchors would directly infringe the '031 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '031 patent, Smith & Nephew marketed and sold its TwinFix Ti suture anchors to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '031 patent by using Smith & Nephew's TwinFix Ti suture anchors following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors. These materials are publicly available and/or provided with Smith & Nephew's TwinFix Ti suture anchors.

491.   Each of Smith & Nephew's TwinFix Ti suture anchors has no substantial, non-infringing uses for at least the reason that each of these suture anchors can only be used to directly infringe the '031 patent. In other words, when Smith & Nephew's instructions and

directions are followed to use its TwinFix Ti suture anchors, these suture anchors are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

492.    Each of Smith & Nephew's TwinFix Ti suture anchors constitutes a material part of the invention of the '031 patent for at least the reason that they each are advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '031 patent. The surgeries Smith & Nephew promotes through its instructional materials require the use of these suture anchors thereby reading on at least one claim of the '031 patent.

493.    Smith & Nephew knew and/or knows that its TwinFix Ti suture anchors are each especially made or especially adapted for use in an infringement of the '031 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these suture anchors, including the instructions for use for these suture anchors, promotes using these suture anchors thereby reading on at least one claim of the '031 patent.

494.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '031 patent. Smith & Nephew has knowledge of the '031 patent and its infringement of the '031 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '031 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '031 patent and the infringement of the '031 patent as a result of this letter.

495.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '031 patent. Upon

132

information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

496.    Upon information and belief, Smith & Nephew also has knowledge of the '031 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

497.    Upon information and belief, Smith & Nephew has not made any changes to any of its TwinFix Ti suture anchors despite its knowledge of the '031 patent.

498.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its TwinFix Ti suture anchors despite its knowledge of the '031 patent.

499.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market,  and  its  use  of  instructional  literature  and/or  information  that  promotes  direct infringement by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '031 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '031 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '031 patent resulting from the surgeons' use of its TwinFix Ti suture anchors.

500.    Smith & Nephew knew of the '031 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known

of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

501.   As a result, Smith & Nephew's infringement of the '031 patent is and has been willful and deliberate.

502.   Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXIV
### (DIRECT INFRINGEMENT OF U.S. PATENT 7,195,634 BY SMITH & NEPHEW)

503.   Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

504.   The '634 patent remains valid, enforceable, and unexpired.

505.   Smith & Nephew is directly infringing and has directly infringed the '634 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a suture anchor assembly covered by at least one claim of the '634 patent, including, but not limited to, Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies.

506.   Smith & Nephew's infringement of the '634 patent is and has been willful and deliberate.

507.   Smith & Nephew also has knowledge of the '634 patent and that its actions infringed the '634 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and

continues to, infringe certain Arthrex patents, including the '634 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '634 patent and the infringement of the '634 patent as a result of this letter.

508.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '634 patent. Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

509.    Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

510.    At the very least, based on Mr. Schmieding's June 1, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, publicly available literature regarding Arthrex's patents, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

511.    Smith & Nephew knew of the '634 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

512.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.   The threatened injury to

Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

**COUNT XXXV**
**(INDUCED INFRINGEMENT OF U.S. PATENT 7,195,634 BY SMITH & NEPHEW)**

513.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

514.    The '634 patent remains valid, enforceable, and unexpired.

515.    With knowledge of the '634 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '634 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a suture anchor assembly including, but not limited to, Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '634 patent by making and/or using Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies in their surgeries thereby reading on at least one claim of the '634 patent.

516.    Smith & Nephew specifically intended its customers to infringe the '634 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies would directly infringe the '634 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '634 patent, Smith & Nephew marketed and sold its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '634 patent by making and/or using Smith &

136

Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchors. These materials are publicly available and/or provided with Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies.

517.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '634 patent. Smith & Nephew has knowledge of the '634 patent and its infringement of the '634 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '634 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '634 patent and the infringement of the '634 patent as a result of this letter.

518.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '634 patent. Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

519.    Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

520.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies despite its knowledge of the '634 patent.

137

521.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies despite its knowledge of the '634 patent.

522.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '634 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '634 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '634 patent resulting from the surgeons' use of its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies.

523.    Smith & Nephew knew of the '634 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

524.    As a result, Smith & Nephew's infringement of the '634 patent is and has been willful and deliberate.

525.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened

injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXVI
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 7,195,634 BY SMITH & NEPHEW)

526.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

527.    The '634 patent remains valid, enforceable, and unexpired.

528.    With knowledge of the '634 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '634 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a suture anchor, including, but not limited to, Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies, for use by its orthopedic surgeon customers.

529.    Smith & Nephew markets and sells its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies to orthopedic surgeons who use Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies in their surgeries thereby reading on at least one claim of the '634 patent.

530.    Smith & Nephew specifically contributed to its customers' infringement of the '634 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies would directly infringe the '634 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '634 patent, Smith & Nephew marketed and sold its MINITAC Ti suture

anchor assemblies and/or TwinFix Ti suture anchor assemblies to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '634 patent by using Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these suture anchor assemblies. These materials are publicly available and/or provided with Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies.

531.   Each of Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies has no substantial, non-infringing uses for at least the reason that each of these suture anchor assemblies can only be used to directly infringe the '634 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies, these suture anchor assemblies are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

532.   Each of Smith & Nephew's MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies constitutes a material part of the invention of the '634 patent for at least the reason that they are each advertised, sold, and/or offered for sale for use as an apparatus that is covered by at least one claim of the '634 patent. The surgeries Smith & Nephew promotes through its instructional materials require the use of these suture anchors thereby reading on at least one claim of the '634 patent.

533.   Smith & Nephew knew and/or knows that its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies are each especially made or especially adapted for use in an infringement of at least one claim of the '634 patent for at least the reason

that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these suture anchors, including the instructions for use for these suture anchors, promotes using these suture anchor assemblies thereby reading on at least one claim of the '634 patent.

534.    Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '634 patent. Smith & Nephew has knowledge of the '634 patent and its infringement of the '634 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '634 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '634 patent and the infringement of the '634 patent as a result of this letter.

535.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '634 patent. Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

536.    Upon information and belief, Smith & Nephew also has knowledge of the '634 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Shoulder Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 16].

537.    Upon information and belief, Smith & Nephew has not made any changes to any of its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies despite its knowledge of the '634 patent.

538.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies despite its knowledge of the '634 patent.

539.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '634 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '634 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '634 patent resulting from the surgeons' use of its MINITAC Ti suture anchor assemblies and/or TwinFix Ti suture anchor assemblies.

540.    Smith & Nephew knew of the '634 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

541.    As a result, Smith & Nephew's infringement of the '634 patent is and has been willful and deliberate.

542.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The

threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXVII
## (DIRECT INFRINGEMENT OF U.S. PATENT 7,329,272 BY SMITH & NEPHEW)

543.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

544.    The '272 patent remains valid, enforceable, and unexpired.

545.    Smith & Nephew is directly infringing and has directly infringed the '272 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a system covered by at least one claim of the '272 patent, including, but not limited to, Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products.

546.    Smith & Nephew's infringement of the '272 patent is and has been willful and deliberate.

547.    Smith & Nephew also has knowledge of the '272 patent and that its actions infringed the '272 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

548.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15 and 19].

549.    Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Arthrex's "PushLock Knotless Instability Repair," 2011, attached as Exhibit 20].

550.    At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, publicly available literature regarding Arthrex's patents, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

551.    Smith & Nephew knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

552.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXVIII
## (INDUCED INFRINGEMENT OF U.S. PATENT 7,329,272 BY SMITH & NEPHEW)

553.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

554.    The '272 patent remains valid, enforceable, and unexpired.

144

555.    With knowledge of the '272 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '272 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a system including, but not limited to, Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products, for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '272 patent by making and/or using Smith & Nephew's MultiFix Knotless Implant Products in their surgeries thereby reading on at least one claim of the '272 patent.

556.    Smith & Nephew specifically intended its customers to infringe the '272 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products would directly infringe the '272 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '272 patent, Smith & Nephew marketed and sold its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '272 patent by making and/or using Smith & Nephew's LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these implants. These materials are publicly available and/or provided with Smith & Nephew's LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products.

557.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '272 patent. Smith & Nephew has knowledge of the '272 patent and its

145

infringement of the '272 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

558.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

559.    Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 20].

560.    Upon information and belief, Smith & Nephew has not made any changes to any of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

561.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

562.    At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor

market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '272 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '272 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '272 patent resulting from the surgeons' use of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products.

563.    Smith & Nephew knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

564.    As a result, Smith & Nephew's infringement of the '272 patent is and has been willful and deliberate.

565.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XXXIX
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 7,329,272 BY SMITH & NEPHEW)

566.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

567.    The '272 patent remains valid, enforceable, and unexpired.

147

568.    With knowledge of the '272 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '272 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a system including, but not limited to, Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products, for use by its orthopedic surgeon customers.

569.    Smith & Nephew markets and sells its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons who use Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products in their surgeries as the system of the '272 patent.

570.    Smith & Nephew specifically contributed to its customers' infringement of the '272 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products would directly infringe the '272 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '272 patent, Smith & Nephew marketed and sold its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '272 patent by using Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these implants. These materials are publicly available and/or provided with Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products.

571.    Each of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products have no substantial, non-infringing uses for at least the reason that each of these implants can only be used to directly infringe the '272 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products, these implants are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

572.    Each of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products constitutes a material part of the invention of the '272 patent for at least the reason that they are advertised, sold, and/or offered for sale for use according to at least one claim of the '272 patent. The surgeries Smith & Nephew promotes through its instructional materials require the use of these implants thereby reading on at least one claim of the '272 patent.

573.    Smith & Nephew knew and/or knows that its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products are each especially made or especially adapted for use in an infringement of at least on claim of the '272 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these implants, including the instructions for use for these products, promotes using these implants thereby reading on at least one claim of the '272 patent.

574.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '272 patent. Smith & Nephew has knowledge of the '272 patent and its infringement of the '272 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to

Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

575.   Upon information and belief, Smith & Nephew also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

576.   Upon information and belief, Smith & Nephew also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 20].

577.   Upon information and belief, Smith & Nephew has not made any changes to any of its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

578.   Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

579.   At the very least, based on Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringement by surgeons, Smith & Nephew believed that there was a high probability that its

acts, if taken, would result in direct infringement of the '272 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '272 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '272 patent resulting from the surgeons' use of Smith & Nephew's LabraLock P Knotless Implants and/or Smith & Nephew's MultiFix Knotless Implant Products.

580.    Smith & Nephew knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

581.    As a result, Smith & Nephew's infringement of the '272 patent is and has been willful and deliberate.

582.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XL
## (DIRECT INFRINGEMENT OF U.S. PATENT 7,329,272 BY ARTHROCARE)

583.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

584.    The '272 patent remains valid, enforceable, and unexpired.

585.    ArthroCare is directly infringing and has directly infringed the '272 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, a system covered by at least one claim of the '272 patent, including,

151

but not limited to, ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products.

586.    ArthroCare's infringement of the '272 patent is and has been willful and deliberate.

587.    ArthroCare also has knowledge of the '272 patent and that its actions infringed the '272 patent at least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

588.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information and belief, ArthroCare also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

589.    Upon information and belief, ArthroCare also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 20].

590.    At the very least, based on Mr. Schmieding's June 10, 2015 letter to Mr. Gorman, ArthroCare's knowledge of Arthrex's patent portfolio in general, publicly available literature regarding Arthrex's patents, and its knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement.

591.    ArthroCare knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

592.    Arthrex and ArthroCare are competitors.   Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of ArthroCare's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

### COUNT XLI
### (INDUCED INFRINGEMENT OF U.S. PATENT 7,329,272 BY ARTHROCARE)

593.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

594.    The '272 patent remains valid, enforceable, and unexpired.

595.    With knowledge of the '272 patent, ArthroCare has induced and continues to induce the infringement of at least claim 1 of the '272 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, a symptom including, but not limited to, ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products, for use by its orthopedic surgeon customers. In light of ArthroCare's inducement, these orthopedic surgeon customers directly infringe the '272 patent by making and/or using ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products in their surgeries thereby reading on at least one claim of the '272 patent.

596.    ArthroCare specifically intended its customers to infringe the '272 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products would directly infringe the '272 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '272 patent, ArthroCare marketed and sold its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '272 patent by making and/or using ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for these implants. These materials are publicly available and/or provided with ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products.

597.    ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '272 patent. ArthroCare has knowledge of the '272 patent and its infringement of the '272 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

598.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information

and belief, ArthroCare also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

599.    Upon information and belief, ArthroCare also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 20].

600.    Upon information and belief, ArthroCare has not made any changes to any of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

601.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

602.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringement by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '272 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '272 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '272 patent resulting from the surgeons' use of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products.

603.    ArthroCare knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

604.    As a result, ArthroCare's infringement of the '272 patent is and has been willful and deliberate.

605.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XLII
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 7,329,272 BY ARTHROCARE)

606.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

607.    The '272 patent remains valid, enforceable, and unexpired.

608.    With knowledge of the '272 patent, ArthroCare has contributed and continues to contribute to the infringement of at least one claim of the '272 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, a system, including, but not limited to, ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products, for use by its orthopedic surgeon customers.

609.    ArthroCare markets and sells its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons who use ArthroCare's LabraLock P Knotless

Implants and/or ArthroCare's MultiFix Knotless Implant Products in their surgeries as the system of the '272 patent.

610.    ArthroCare specifically contributed to its customers' infringement of the '272 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products would directly infringe the '272 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '272 patent, ArthroCare marketed and sold its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '272 patent by using ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products following the instructions for use and other instructional literature and/or information prepared and provided by ArthroCare for these implants. These materials are publicly available and/or provided with ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products.

611.    Each of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products has no substantial, non-infringing uses for at least the reason that each of these implants can only be used to directly infringe the '272 patent. In other words, when ArthroCare's instructions and directions are followed to use its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products, these implants are only used in an infringing manner, and are only advertised by ArthroCare for such an infringing use.

612.    Each of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products constitutes a material part of the invention of the '272 patent

for at least the reason that they are each advertised, sold, and/or offered for sale for use according to at least one claim of the '272 patent. The surgeries ArthroCare promotes through its instructional materials require the use of these implants.

613.    ArthroCare knew and/or knows that its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products are each especially made or especially adapted for use in an infringement of at least one claim of the '272 patent for at least the reason that the publicly available literature and information ArthroCare provides, endorses, and promotes for using these implants, including the instructions for use for these products, promotes using these implants thereby reading on at least one claim of the '272 patent.

614.    ArthroCare knew that the surgeons' actions, when performed, would directly infringe the '272 patent. ArthroCare has knowledge of the '272 patent and its infringement of the '272 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing ArthroCare that it was, and continues to, infringe certain Arthrex patents, including the '272 patent. [Exhibit 14]. At a minimum, ArthroCare was aware of the '272 patent and the infringement of the '272 patent as a result of this letter.

615.    Upon information and belief, ArthroCare also has knowledge of patents related to the suture anchor industry in general and would be aware of the '272 patent. Upon information and belief, ArthroCare also has knowledge of the '272 patent through publicly available notices on Arthrex's website. [See e.g. Exhibits 15 and 19].

616.    Upon information and belief, ArthroCare also has knowledge of the '272 patent through publicly available Arthrex informational literature, including, but not limited to, those

relating to Surgical Repair Technology, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 20].

617.    Upon information and belief, ArthroCare has not made any changes to any of its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

618.    Upon information and belief, ArthroCare has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its LabraLock P Knotless Implants and/or MultiFix Knotless Implant Products despite its knowledge of the '272 patent.

619.    At the very least, based on ArthroCare's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  ArthroCare's knowledge that Arthrex is a direct competitor in the relatively small suture anchor market, and its use of instructional literature and/or information that promotes direct infringement by surgeons, ArthroCare believed that there was a high probability that its acts, if taken, would result in direct infringement of the '272 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, ArthroCare willfully blinded itself to the existence of the '272 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '272 patent resulting from the surgeons' use of ArthroCare's LabraLock P Knotless Implants and/or ArthroCare's MultiFix Knotless Implant Products.

620.    ArthroCare knew of the '272 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

621.    As a result, ArthroCare's infringement of the '272 patent is and has been willful and deliberate.

622.    Arthrex and ArthroCare are competitors.  As a result of ArthroCare's contributing to its surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to ArthroCare.  Injunctive relief would not disserve the public interest under these circumstances.

<b><u>COUNT XLIII</u></b><br><b>(DIRECT INFRINGEMENT OF U.S. PATENT 6,875,216 BY SMITH & NEPHEW)</b>

623.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

624.    The '216 patent remains valid, enforceable, and unexpired.

625.    Smith & Nephew is directly infringing and has directly infringed the '216 patent, including, without limitation, by making, using, selling, offering for sale, and/or importing, without license or authority, surgical instruments and/or surgical instrument assemblies covered by at least one claim of the '216 patent, including but not limited to Smith & Nephew's BIOSURE bioabsorbable interference screws.

626.    Smith & Nephew's BIOSURE bioabsorbable interference screws fall within the scope of one or more claims of the '216 patent.  Smith & Nephew directly infringes at least one claim of the '216 patent.

627.    Smith & Nephew's infringement of the '216 patent is and has been willful and deliberate.

628.    Smith & Nephew has knowledge of the '216 patent and that its actions infringed the '216 patent.  Smith & Nephew has knowledge of the '216 patent at the very least based on a

160

meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents Arthrex alleges that Smith & Nephew was, and continues to infringe, including the '216 patent. At a minimum, Smith & Nephew is aware of the '216 patent and the infringement of the '216 patent as a result of this meeting.

629.    Smith & Nephew also has knowledge of the '216 patent and that its actions infringed the '216 patent based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '216 patent. [Exhibit 14]. At a minimum, Smith & Nephew is aware of the '216 patent and the infringement of the '216 patent as a result of this letter.

630.    Smith and Nephew also has knowledge of the '216 patent and that its actions infringed the '216 patent at least based on Arthrex's filing of the previous E.D. Texas Complaint alleging Smith & Nephew's infringement of the '216 patent. The E.D. Texas Complaint was dismissed without prejudice.

631.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the interference screw industry in general and would be aware of the '216 patent. Upon information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

632.    Upon information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available Arthrex informational literature, including but not limited to those relating to Knee Ligament Reconstruction and Repair, which indicate Arthrex's patents

relevant to Arthrex's products and illustrated techniques. [See e.g. Arthrex's "The Most Advanced Techniques in Knee Ligament Reconstruction and Repair, 2013, attached as Exhibit 21].

633.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman, the E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, and its knowledge that Arthrex is a direct competitor in the relatively small bioabsorbable interference screw market, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement.

634.    Smith & Nephew knew of the '216 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

635.    Arthrex and Smith & Nephew are competitors.  Arthrex has suffered substantial damages and will suffer severe and irreparable harm as a result of Smith & Nephew's infringement, unless that infringement is enjoined by this Court.  The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew.  Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XLIV
### (INDUCED INFRINGEMENT OF U.S. PATENT 6,875,216 BY SMITH & NEPHEW)

636.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

637.    The '216 patent remains valid, enforceable and unexpired.

638.    With knowledge of the '216 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '216 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, surgical instruments and/or surgical instrument assemblies covered by the '216 patent, including but not limited to Smith & Nephew's BIOSURE bioabsorbable interference screws, for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '216 patent by using at least the BIOSURE bioabsorbable interference screws in their surgeries thereby reading on at least one claim of the '216 patent.

639.    Smith & Nephew specifically intended its customers to infringe the '216 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of the BIOSURE bioabsorbable interference screws would directly infringe the '216 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '216 patent, Smith & Nephew marketed and sold the BIOSURE bioabsorbable interference screws to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '216 patent by performing surgery following the instructions for use and other instructional literature and information prepared and provided by Smith & Nephew for each of the BIOSURE bioabsorbable interference screws. These materials are publicly available and/or provided with the BIOSURE bioabsorbable interference screws.

640.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '216 patent. Smith & Nephew has knowledge of the '216 patent and its infringement of the '216 patent, or willfully blinded itself to such knowledge, at the very least based on a meeting between Mr. John Schmieding and Mr. Jack Campo, Chief Legal Office for

Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents Arthrex alleges that Smith & Nephew was, and continues to infringe, including the '216 patent. At a minimum, Smith & Nephew is aware of the '216 patent and the infringement of the '216 patent as a result of this meeting.

641.    Smith & Nephew also has knowledge of the '216 patent and that its actions infringed the '216 patent based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '216 patent. [Exhibit 14]. At a minimum, Smith & Nephew is aware of the '216 patent and the infringement of the '216 patent as a result of this letter.

642.    Smith and Nephew also has knowledge of the '216 patent and that its actions infringed the '216 patent based on Arthrex's filing of the E.D. Texas Complaint alleging Smith & Nephew's infringement of the '216 patent. The E.D. Texas Complaint was dismissed without prejudice.

643.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the interference screw industry in general and would be aware of the '216 patent. Upon information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available Arthrex informational literature, including but not limited to those relating to Knee Ligament Reconstruction and Repair which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 21].

644.    Upon information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

645.    Upon information and belief, Smith & Nephew has not made any changes to any of the BIOSURE bioabsorbable interference screw products despite its knowledge of the '216 patent.

646.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use for the BIOSURE bioabsorbable interference screws despite its knowledge of the '216 patent.

647.    At the very least, Smith & Nephew willfully blinded itself to the existence of the '216 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '216 patent resulting from the surgeons' use of the BIOSURE bioabsorbable interference screws.

648.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  the E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, its knowledge that Arthrex is a direct competitor in the relatively small bioabsorbable interference screw market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '216 patent by its surgeon customers and/or deliberately avoided confirming that belief. In other words, at a minimum, Smith & Nephew willfully blinded itself to its surgeon customers' direct infringement of the '216 patent resulting from the use of the BIOSURE bioabsorbable interference screws.

649.    Smith & Nephew knew of the '216 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

650.     As a result, Smith & Nephew's infringement of the '216 patent is and has been willful and deliberate.

651.     Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

### COUNT XLV
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT 6,875,216 BY SMITH & NEPHEW)

652.     Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

653.     The '216 patent remains valid, enforceable, and unexpired.

654.     With knowledge of the '216 patent, Smith & Nephew has contributed and continues to contribute to the infringement of at least one claim of the '216 patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing, without license or authority, surgical instruments covered by the '216 patent, including, but not limited to, Smith & Nephew's BIOSURE bioabsorbable interference screws, for use by its orthopedic surgeon customers.

655.     Smith & Nephew markets and sells its BIOSURE bioabsorbable interference screws to orthopedic surgeons who use Smith & Nephew's BIOSURE bioabsorbable interference screws in their surgeries as the interference screw of the '216 patent.

656.     Smith & Nephew specifically contributed to its customers' infringement of the '216 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of Smith & Nephew's BIOSURE bioabsorbable

interference screws would directly infringe the '216 patent. Despite a high likelihood that its actions would contribute to its surgeon customers' direct infringement of the '216 patent, Smith & Nephew marketed and sold its BIOSURE bioabsorbable interference screws to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '216 patent by using Smith & Nephew's BIOSURE bioabsorbable interference screws following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for these BIOSURE bioabsorbable interference screws. These materials are publicly available and/or provided with Smith & Nephew's BIOSURE bioabsorbable interference screws.

657.    Smith & Nephew's BIOSURE bioabsorbable interference screws have no substantial, non-infringing uses for at least the reason that these BIOSURE bioabsorbable interference screws can only be used to directly infringe the '216 patent. In other words, when Smith & Nephew's instructions and directions are followed to use its BIOSURE bioabsorbable interference screws, these BIOSURE bioabsorbable interference screws are only used in an infringing manner, and are only advertised by Smith & Nephew for such an infringing use.

658.    Smith & Nephew's BIOSURE bioabsorbable interference screws constitutes a material part of the invention of the '216 patent for at least the reason that they are advertised, sold, and/or offered for sale for use according to at least one claim of the '216 patent. The surgeries Smith & Nephew promotes through its instructional materials require the use of these BIOSURE bioabsorbable interference screws thereby reading on at least one claim of the '216 patent.

659.    Smith & Nephew knew and/or knows that its BIOSURE bioabsorbable interference screws are especially made or especially adapted for use in an infringement of the

167

'216 patent for at least the reason that the publicly available literature and information Smith & Nephew provides, endorses, and promotes for using these BIOSURE bioabsorbable interference screws, including the instructions for use for these products, promotes using these BIOSURE bioabsorbable interference screws thereby reading on at least one claim of the '216 patent.

660.   Smith & Nephew knew and/or knows that the surgeons' actions, when performed, would directly infringe the '216 patent.

661.   Smith & Nephew has knowledge of the '216 patent and that its actions infringed the '216 patent.  Smith & Nephew has knowledge of the '216 patent at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents Arthrex alleges that Smith & Nephew was, and continues to infringe, including the '216 patent. At a minimum, Smith & Nephew is aware of the '216 patent and the infringement of the '216 patent as a result of this meeting.

662.   Smith & Nephew also has knowledge of the '216 patent and its infringement of the '216 patent, or willfully blinded itself to such knowledge, at the very least based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '216 patent. [Exhibit 14]. At a minimum, Smith & Nephew was aware of the '216 patent and the infringement of the '216 patent as a result of this letter.

663.   Upon information and belief, Smith & Nephew also has knowledge of patents related to the interference screw industry in general and would be aware of the '216 patent. Upon

information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

664.    Upon information and belief, Smith & Nephew also has knowledge of the '216 patent through publicly available Arthrex informational literature, including, but not limited to, those relating to Knee Ligament Reconstruction and Repair, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 21].

665.    Upon information and belief, Smith & Nephew has not made any changes to any of its BIOSURE bioabsorbable interference screws despite its knowledge of the '216 patent.

666.    Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for its BIOSURE bioabsorbable interference screws despite its knowledge of the '216 patent.

667.    At the very least, based on the meeting between Mr. Schmeiding and Mr. Campo, Smith & Nephew's knowledge of Arthrex's patent portfolio in general,  the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  Smith & Nephew's knowledge that Arthrex is a direct competitor in the relatively small interference screw market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '216 patent by its surgeon customers, yet deliberately avoided confirming that belief. At the very least, Smith & Nephew willfully blinded itself to the existence of the '216 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '216 patent resulting from the surgeons' use of Smith & Nephew's BIOSURE bioabsorbable interference screws.

668.    Smith & Nephew knew of the '216 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known

of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

669.    As a result, Smith & Nephew's infringement of the '216 patent is and has been willful and deliberate.

670.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's contributing to surgeons' infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XLVI
## (INDUCED INFRINGEMENT OF U.S. PATENT 7,322,986 BY SMITH & NEPHEW)

671.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

672.    The '986 patent remains valid, enforceable and unexpired.

673.    With knowledge of the '986 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '986 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, surgical instruments covered by the '986 patent, including but not limited to Smith & Nephew's BIOSURE bioabsorbable interference screws and/or Smith & Nephew's BIORCI bioabsorbable interference screws ("the accused '986 patent interference screw products"), for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '986 patent by using the accused '986 patent interference screw products in their surgeries, thereby reading on at least one claim of the '986 patent.

674.    Smith & Nephew specifically intended its customers to infringe the '986 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of the accused '986 patent interference screw products would directly infringe the '986 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '986 patent, Smith & Nephew marketed and sold the accused '986 patent interference screw products to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '986 patent by performing surgery following the instructions for use and other instructional literature and information prepared and provided by Smith & Nephew for each of the accused '986 patent interference screw products. These materials are publicly available and/or provided with the accused '986 patent interference screw products.

675.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '986 patent. Smith & Nephew has knowledge of the '986 patent and its infringement of the '986 patent, or willfully blinded itself to such knowledge, at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents Arthrex alleges that Smith & Nephew was, and continues to infringe, including the '986 patent. At a minimum, Smith & Nephew is aware of the '986 patent and the infringement of the '986 patent as a result of this meeting.

676.    Smith & Nephew also has knowledge of the '986 patent and that its actions infringed the '986 patent based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and

continues to, infringe certain Arthrex patents, including the '986 patent. [Exhibit 14]. At a minimum, Smith & Nephew is aware of the '986 patent and the infringement of the '986 patent as a result of this letter.

677.     Smith and Nephew also has knowledge of the '986 patent and that its actions infringed the '986 patent based on Arthrex's filing of the E.D. Texas Complaint alleging Smith & Nephew's infringement of the '986 patent. The E.D. Texas Complaint was dismissed without prejudice.

678.     Upon information and belief, Smith & Nephew also has knowledge of patents related to the interference screw industry in general and would be aware of the '986 patent. Upon information and belief, Smith & Nephew also has knowledge of the '986 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

679.     Upon information and belief, Smith & Nephew also has knowledge of the '986 patent through publicly available Arthrex informational literature, including but not limited to those relating to Knee Ligament Reconstruction and Repair, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 21].

680.     Upon information and belief, Smith & Nephew has not made any changes to any of the accused '986 patent interference screw products despite its knowledge of the '986 patent.

681.     Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use for the accused '986 patent interference screw products despite its knowledge of the '986 patent.

682.     At the very least, Smith & Nephew willfully blinded itself to the existence of the '986 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '986 patent resulting from the surgeons' use of the accused '986 patent interference screw products.

683.    At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman, the E.D. Texas Complaint, its knowledge that Arthrex is a direct competitor in the relatively small bioabsorbable interference screw market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '986 patent by its surgeon customers and/or deliberately avoided confirming that belief. In other words, at a minimum, Smith & Nephew willfully blinded itself to its surgeon customers' direct infringement of the '986 patent resulting from the use of the accused '986 patent interference screw products.

684.    Smith & Nephew knew of the '986 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

685.    As a result, Smith & Nephew's infringement of the '986 patent is and has been willful and deliberate.

686.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## COUNT XLVII
## (INDUCED INFRINGEMENT OF U.S. PATENT 6,629,977 BY SMITH & NEPHEW)

687.    Arthrex incorporates by reference all of the preceding paragraphs as though fully set forth herein.

688.    The '977 patent remains valid, enforceable and unexpired.

689.    With knowledge of the '977 patent, Smith & Nephew has induced and continues to induce the infringement of at least one claim of the '977 patent under 35 U.S.C. § 271(b) by selling, offering to sell, and/or importing, without license or authority, surgical instruments covered by the '977 patent, including but not limited to Smith & Nephew's BIOSURE bioabsorbable interference screws, for use by its orthopedic surgeon customers. In light of Smith & Nephew's inducement, these orthopedic surgeon customers directly infringe the '977 patent by using the Smith & Nephew BIOSURE bioabsorbable interference screws in their surgeries thereby reading on at least one claim of the '977 patent.

690.    Smith & Nephew specifically intended its customers to infringe the '977 patent and knew that its customers' acts constituted infringement, or at the very least, was willfully blind to the fact that surgeons' use of the Smith & Nephew BIOSURE bioabsorbable interference screws would directly infringe the '977 patent. Despite a high likelihood that its actions would induce its surgeon customers' direct infringement of the '977 patent, Smith & Nephew marketed and sold the Smith & Nephew BIOSURE bioabsorbable interference screws to orthopedic surgeons for use in their surgeries. These orthopedic surgeons directly infringe the '977 patent by performing surgery following the instructions for use and other instructional literature and/or information prepared and provided by Smith & Nephew for the Smith & Nephew BIOSURE bioabsorbable interference screws. These materials are publicly available and/or provided with the Smith & Nephew BIOSURE bioabsorbable interference screws.

691.    Smith & Nephew knew that the surgeons' actions, when performed, would directly infringe the '977 patent. Smith & Nephew has knowledge of the '977 patent and its infringement of the '977 patent, or willfully blinded itself to such knowledge, at the very least based on a meeting between Mr. John Schmieding, General Counsel for Arthrex, and Mr. Jack Campo, Chief Legal Office for Smith & Nephew. At this meeting on or about March 12, 2014, Mr. Schmieding informed Mr. Campo of certain Arthrex patents Arthrex alleges that Smith & Nephew was, and continues to, infringe, including the '977 patent. At a minimum, Smith & Nephew is aware of the '977 patent and the infringement of the '977 patent as a result of this meeting.

692.    Smith & Nephew also has knowledge of the '977 patent and that its actions infringed the '977 patent based on communications from Arthrex. On June 10, 2015, Mr. John Schmieding sent a letter to Mr. Mark Gorman informing Smith & Nephew that it was, and continues to, infringe certain Arthrex patents, including the '977 patent. [Exhibit 14]. At a minimum, Smith & Nephew is aware of the '977 patent and the infringement of the '977 patent as a result of this letter.

693.    Smith and Nephew also has knowledge of the '977 patent and that its actions infringed the '977 patent based on Arthrex's filing of the E.D. Texas Complaint alleging Smith & Nephew's infringement of the '977 patent. The E.D. Texas Complaint was dismissed without prejudice.

694.    Upon information and belief, Smith & Nephew also has knowledge of patents related to the interference screw industry in general and would be aware of the '977 patent. Upon information and belief, Smith & Nephew also has knowledge of the '977 patent through publicly available notices on Arthrex's website. [See e.g. Exhibit 15].

695.   Upon information and belief, Smith & Nephew also has knowledge of the '977 patent through publicly available Arthrex informational literature, including but not limited to those relating to Knee Ligament Reconstruction and Repair, which indicate Arthrex's patents relevant to Arthrex's products and illustrated techniques. [See e.g. Exhibit 21].

696.   Upon information and belief, Smith & Nephew has not made any changes to any of the Smith & Nephew BIOSURE bioabsorbable interference screws despite its knowledge of the '977 patent.

697.   Upon information and belief, Smith & Nephew has not made any changes to any of its publicly available instructional product literature, including the instructions for use, for the Smith & Nephew BIOSURE bioabsorbable interference screws despite its knowledge of the '977 patent.

698.   At the very least, Smith & Nephew willfully blinded itself to the existence of the '977 patent, and therefore willfully blinded itself to surgeons' direct infringement of the '977 patent resulting from the surgeons' use of the Smith & Nephew BIOSURE bioabsorbable interference screws.

699.   At the very least, based on the meeting between Mr. Schmieding and Mr. Campo, the June 10, 2015 letter from Mr. Schmieding to Mr. Gorman,  the E.D. Texas Complaint, Smith & Nephew's knowledge of Arthrex's patent portfolio in general, its knowledge that Arthrex is a direct competitor in the relatively small bioabsorbable interference screw market, and its use of instructional literature and/or information that promotes direct infringements by surgeons, Smith & Nephew believed that there was a high probability that its acts, if taken, would result in direct infringement of the '977 patent by its surgeon customers and/or deliberately avoided confirming that belief. In other words, at a minimum, Smith & Nephew willfully blinded itself to its surgeon

customers' direct infringement of the '977 patent resulting from the use of the Smith & Nephew BIOSURE bioabsorbable interference screws.

700.    Smith & Nephew knew of the '977 patent, acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, knew or should have known of this likelihood, and ignored and/or disregarded that its actions constituted infringement of a valid and enforceable patent.

701.    As a result, Smith & Nephew's infringement of the '977 patent is and has been willful and deliberate.

702.    Arthrex and Smith & Nephew are competitors.  As a result of Smith & Nephew's inducement of infringement, Arthrex will suffer severe and irreparable harm, unless that infringement is enjoined by this Court, and has suffered substantial damages. The threatened injury to Arthrex outweighs any harm that the injunction may cause to Smith & Nephew. Injunctive relief would not disserve the public interest under these circumstances.

## RAYER FOR RELIEF

WHEREFORE, Arthrex requests judgment in its favor against Smith & Nephew and ArthroCare for the following relief:

A.    A judgment in favor of Plaintiff that Smith & Nephew has directly infringed the '451, '186, '052, '755, '541, '499, '031, '634, '272, and '216 patents;

B.    A judgment in favor of Plaintiff that Smith & Nephew has indirectly infringed the '451, '186, '052, '755, '541, '499, '031, '634, '272, '216, '977, and '986 patents;

C.    A preliminary and permanent injunction enjoining Smith & Nephew, its officers, directors, agents, servants, employees and those persons in active concert or participation with Smith & Nephew, from infringing the '451, '186, '052, '755, '541, '499, '031, '634, '272, '216, '977, and '986  patents in violation of 35 U.S.C. § 271;

D.      An award of damages adequate to compensate Plaintiff for Smith & Nephew's infringement, including lost profits and a reasonable royalty;

E.      An order adjudging Smith & Nephew to have deliberately and willfully infringed the '451, '186, '052, '755, '541, '499, '031, '634, '272, '216, '977, and '986 patents and trebling, or otherwise increasing, Plaintiff's damages under 35 U.S.C. § 284;

F.      A judgment in favor of Plaintiff that ArthroCare has directly infringed the '186, '052, '755, '541, and '272 patents;

G.      A judgment in favor of Plaintiff that ArthroCare has indirectly infringed the '186, '052, '755, '541, and '272 patents;

H.      A preliminary and permanent injunction enjoining ArthroCare, its officers, directors, agents, servants, employees and those persons in active concert or participation with ArthroCare, from infringing the '186, '052, '755, '541, and '272 patents in violation of 35 U.S.C. § 271;

I.      An order adjudging ArthroCare to have deliberately and willfully infringed the '186, '052, '755, '541, and '272 patents and trebling, or otherwise increasing, Plaintiff's damages under 35 U.S.C. § 284;

J.      An award of damages adequate to compensate Plaintiff for ArthroCare's infringement, including lost profits and a reasonable royalty;

K.      A judgment in favor of Plaintiff that this is an exceptional case;

L.      An award to Plaintiff of its attorney fees and its costs and expenses incurred in connection with this action pursuant to 35 U.S.C. § 285;

M.      An award of prejudgment and post-judgment interest and costs of this action; and

N.      Such other and further relief that this Court deems just and proper.

## JURY DEMAND

Arthrex demands a trial by jury on all issues so triable.

Respectfully submitted,

Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Michael A. Benefield
Texas State Bar No. 24073408
mab@emafirm.com
Shawn A. Latchford
Texas State Bar No. 24066603
sal@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

Rodger D. Young
Michigan State Bar No. P22652
young@youngpc.com
Young & Associates
27725 Stansbury Boulevard Suite 125
Farmington Hills, MI 48334
Telephone: (248) 353-8620
Facsimile: (248) 479-7828

*Counsel for Arthrex, Inc.*